No. 2530.

JOHN PEACE v. THE STATE.

1. PRACTICE—CONTINUANCE—NEW TRIAL.—Even if the absent testimony set out in an application for continuance be both admissible and probably true, it will not, if immaterial, require the award of a new trial because of the refusal of the continuance.

2. SAME—CHARGE OF THE COURT—BILL OF EXCEPTION reserved to the charge of the court, if too general or indefinite to point out specific objection, will not be considered on appeal; and, in the absence of a proper bill of exception, this court will examine the charge of the court below only with reference to fundamental errors or such as, under all the circumstances of the case, are calculated to prejudice the rights of the accused.

3. MURDER—FACT CASE.—See the statement of the case for evidence *held* sufficient to support a conviction for murder of the first degree.

APPEAL from the District Court of DeWitt. Tried below before the Hon. H. C. Pleasants.

This conviction was in the first degree for the murder of W. B. Stonebraker, in DeWitt county, Texas, on the fifteenth day of August, 1887. A life term in the penitentiary was the penalty assessed against the appellant.

W. L. Rudd, sheriff of Karnes county, Texas, was the first witness for the State. He testified that he lived in the town of Helena, Karnes county, in August, 1887. About eleven o'clock on the night of Monday, August 15, 1887, the witness was awakened by the shouting of some person at his gate. On going to the gate he found the person to be Milam Odom. Odom was slightly wounded, and was taken by the witness into his, witness's, house. Witness then went to Butler's hotel where John Rutledge lived, and informed Rutledge that Odom, wounded, had arrived from his, Rutledge's, ranch, which was situated in DeWitt county about eight miles from Helena, and reported that somebody on that ranch had been killed. Rutledge then went to get a physician to attend to Odom, and witness summoned a posse and repaired to Rutledge's ranch. Upon his arrival at the ranch he found the dead body of Stonebraker, but there was no living person on the place. The house at Rut-

ledge's ranch was a building of two rooms with a gallery in front. The house fronted south, the rooms standing one behind the other, the small or rear room being a shed room. A door pierced the north side of the shed room, another opened between the two rooms, and a third led from the first room to the gallery. The three doors were on a direct line with each other. The north string of the fence was about twelve feet distant from the house. A light was burning dimly on a table in the southeast corner of the north room when the witness reached the ranch. The body of Stonebraker lay back down, in the north room, his feet near the door between the two rooms and his head pointing towards the northwest corner of the room.

Witness examined the body and found that the left side and front had been pierced by five buck shot. Further describing his discoveries about the house, the witness said: "I also found three shot in the wall just to the right of the door from the front room to the gallery. One of these shots went through the wall; and there were two shots in the front fence, some thirty or forty feet from the house. On the other side of the house, near the north door, there was the remains of a fire in the back yard."

The witness knew the defendant as John Peace. He was delivered to the custody of the witness on Tuesday, the day after the killing, by Lieutenant Grimes of the State ranger service, and witness placed him in the Cuero jail. The last time that witness saw the defendant prior to the killing of Stonebraker was on the Friday preceding the tragedy. He came on that evening to Harper's ranch, where the witness and W. T. Morris and their wives then were. He said that he was on his way to Houston's ranch. Soon after he reached Harper's ranch, Sam Harper got home from Yorktown. In the course of the general conversation which ensued, somebody remarked to defendant interrogatively: "John, do you know that Stonebraker has taken your feather bed?" Defendant replied: "Well, d—n him, if he has, I will kill him. Don't you think I ought to, Rudd?" Witness said, in reply: "No; you ought to do nothing of the kind." A few days after the killing of Stonebraker the witness went to Butler's hotel to look for a pistol. While looking about the gallery Mrs. Butler asked him what he was looking for. He told her, and she directed him to a place on the gallery near a flower stand, where he found the pistol.

Witness kept that pistol until it was claimed by Milam Odom, when he delivered it to him. On his cross examination, the witness said that he did not regard as serious the threat against Stonebraker uttered by the defendant at Harper's ranch.

W. T. Morris and Sam Harper, testifying for the State, corroborated the witness Rudd as to the threats uttered by the defendant at Harper's ranch. Morris further testified that, ten days or two weeks prior to the death of Stonebraker, he was on a scout with Rudd, defendant and others. Witness was armed with a double barreled shot gun that belonged to Rudd. Examining the gun while in the witness's hands, the defendant remarked that he "believed he would borrow that gun from Rudd." Witness asked him if he wanted it to hunt with. He replied: "No; I want it to kill Stonebraker with." The witness, at that time, did not think the defendant made the statement seriously.

D. G. Butler testified, for the State, that he was the proprietor of Butler's hotel, in Helena, Karnes county, Texas. Information about the killing of Stonebraker was brought to the witness's hotel about eleven o'clock on the fatal night. John Rutledge, who boarded at witness's hotel, was then sleeping on the gallery. Upon being informed of the killing of Stonebraker and the wounding of Odom, Rutledge went first to see about having Odom attended to, and then went to his ranch with Rudd. Some time after Rutledge left,—between one and two o'clock,—the defendant came to witness's house. When he stepped on the gallery, the witness looked out of his room to see who he was. Mistaking him for Odom, the witness asked him: "Milam, does your wound hurt you much?" Defendant replied: "This is not Milam," and witness recognized him, and told him that Stonebraker had been killed at Rutledge's ranch, and Odom wounded. He replied that he had been down the country on business for Rutledge, and had not heard of the killing. Witness returned to his room and retired, and defendant lay down in the bed that Rutledge had recently left. Defendant was still in Rutledge's bed on the gallery when witness got up next morning, but left soon afterwards. A horse was tied at the fence when witness got up in the morning, but when he missed the defendant a few minutes later, he observed that the horse was also gone. He next saw the defendant between ten and eleven o'clock on that morning. He was unable to say

whether or not defendant got breakfast at his hotel on that morning.

Milam Odom was the next witness for the State. He testified that he was at Rutledge's ranch at the time Stonebraker was killed. He and the defendant lived at the same ranch, being employes of Rutledge. The witness and Rutledge, in a buggy, left the ranch on the Saturday evening preceding the fatal Monday. They left the doors unlocked. They left Yorktown on Monday evening, passed Stonebraker with two hands, Schneider and Polschinzski, driving a herd of cattle, towards the ranch, and reached the ranch about dark. Rutledge changed horses at the ranch, and in his buggy started on to Helena. Witness got a horse and went back to meet Stonebraker and help him with the cattle, which Rutledge was to pasture for him. It was between eight and nine o'clock when Stonebraker, witness and the two hands reached the ranch and penned the cattle. A fire was immediately built near the back door of the north room, and witness prepared to cook supper. He got a basin of water and placed it on the gallery immediately in front of the door, and proceeded to bathe his face and hands. Stonebraker was then in the shed room. While witness was washing, a shot was fired from behind the house. Witness ran to the front fence, jumped over it, and fled to the point where his horse was hitched, about two hundred yards distant. Witness waited at that point a few minutes, when he ventured to approach as near the house as the tree where his saddle was hanging. From that point he looked into the shed room, in which there was a light burning, and saw the body of a man lying on the floor. He then saddled his horse and rode to Helena. One of the shots fired from the gun at the time of the killing struck the witness in the thigh, inflicting a slight wound.

When the witness and Rutledge left the ranch on Saturday evening, Rutledge's double barreled breech loading shot gun was standing in a corner of the front room. The witness and defendant had used that gun on two or three occasions to kill birds, withdrawing the loads of buckshot and substituting bird shot. Witness could not now remember where he placed the buckshot removed from the gun but thought it probable that he put them either in his trunk or in a box on the mantel in the front room. The gun was loaded with bird shot when witness and Rutledge left the ranch on Saturday. The gun was

not at the ranch when witness looked for it on the morning after the killing. Witness and defendant, who were second cousins, had been living at the ranch about six months at the time of the killing. The witness and Rutledge helped Stonebraker, on the morning of the fatal Monday, gather Stonebraker's cattle in a pasture at Yorktown. While witness and Rutledge were holding some of the cattle at a pen on that morning, defendant came by. Stonebraker was not then at the pen. Defendant knew Stonebraker's brand, and if he asked witness what he was going to do with the cattle—and witness did not remember that he did—witness told him. Witness was unable to say that defendant knew that Stonebraker was going to take the cattle to Rutledge's ranch. Defendant left Rutledge's ranch on a mission for Rutledge on Friday, to go to Houston's ranch, fifteen or twenty miles from Yorktown. He did not get to Yorktown until Saturday. Witness saw him in Yorktown on Saturday and Sunday, and as late as noon on Monday. He left Yorktown about noon, saying that he was going to Allee's ranch, in Goliad county, eighteen miles south from Yorktown, to take a note to Allee from Rutledge. He was then riding a bay horse. The horse he was riding when arrested in Helena, on the day after the killing, was a gray horse that belonged to Rutledge, and that was kept on the ranch. That horse was supposed to be on the ranch when witness and Rutledge left it on Saturday. Witness did not see defendant after he left Yorktown to go to Allee's until after his arrest next day. Witness could not accurately fix the hour at which he and Rutledge left Yorktown on Monday evening, but they drove rapidly in a two horse buggy, and reached the ranch soon after sun set, traversing a distance of twelve miles. In Yorktown, on the Saturday before the killing, the defendant asked the witness for his pistol. Witness told him that it was in his saddle pockets at the house of Mrs. Friar in Yorktown. Defendant said he wanted the pistol to take with him down the country. Witness, some time after the killing, found his pistol in the possession of Sheriff Rudd, claimed and got it.

Cross examined, the witness said that he did not lock the doors of the ranch house when he left it on Saturday. He had often before left the doors unlocked, and frequently missed articles which disappeared from the house during his absence. Whether probable or not, it was quite possible that the shot

gun was stolen from the said house by somebody. The gray horse that defendant was riding when arrested was a very gentle animal. Witness had never caught that horse outside of a pen, but was confident that, with little difficulty, he could be caught when running loose in the pasture. Allee's ranch was about eighteen miles south from Yorktown. It was about the same distance from Rutledge's ranch, which was about twelve miles west from Yorktown. The bay horse that defendant had in Yorktown appeared to be jaded. The witness and defendant frequently accompanied Sheriff Rudd in scouts throughout the country in quest of Will Jacobs and Rheinhardt Schneider, two notorious outlaws. Defendant was afraid to stay at Rutledge's ranch alone. He often went to Yorktown with the witness. They were often in Yorktown at night. Stonebraker was town marshal of Yorktown, and was often on the streets of Yorktown alone at night.

John Rutledge was the next witness for the State. He testified that he and Odom went to Yorktown from his, witness's ranch on the Saturday previous to the fatal Monday, and remained there until Monday evening, when they returned to the ranch, passing Stonebraker with a herd of cattle, and arriving at the ranch after sundown. This witness corroborated Odom as to the distances between the various points named by him, and stated that, in Yorktown, on Monday, he gave defendant a note which he directed him to take to Allee's ranch, and deliver to Allee. Defendant left Yorktown to go to Allee's ranch about noon. When witness and Odom reached witness's ranch, after sundown, on Monday evening, witness changed horses and started on to Helena; sending Odom back to meet Stonebraker and help him with his cattle. The witness's buggy broke down within a mile of his ranch, and witness, anxious to get to Helena that night, released one of the horses, and led the other to the house of a neighbor, where he borrowed a saddle, and went to Helena on horseback. While he was yet in the neighborhood of his ranch on that night, the witness heard no gun shots. About eleven o'clock on that night Odom reached Helena and reported the killing of Stonebraker. Witness went back to the ranch with Rudd on that night, and returned to Helena between eight and nine o'clock. On the next morning the defendant came to the witness in his room in the Butler Hotel, and gave him the note he started to take to Allee, remarking that he did not go to Allee's ranch because he learned

that Allee was not at home. The witness took the note and defendant left, the witness, who was very tired, asking no questions. Defendant was arrested about eleven o'clock on that day. He was then riding a horse that belonged to the witness's ranch, but was not the horse that he had in York-town on Monday—the day of the killing. The witness knew that the defendant did not like Stonebraker, but he often saw the two together in Yorktown. A double barreled, number ten breech loading shot gun was kept at the ranch. It was there when witness and Odom left on Saturday, but had disappeared when witness got to the ranch on Monday night, after the kill-ing. Witness had not seen the gun since the Saturday prior to the killing. The defendant was afraid to and would not stay long at the ranch at night, alone. Defendant passed the pen in Yorktown where witness and Odom, on Monday morning, were holding some of Stonebraker's cattle, but he asked no questions about them that witness heard, and witness said nothing to him about them. It is about a mile and a half to the witness's ranch from the corner of Short's fence on the Yorktown and Helena road. A trail runs from the said corner of Short's fence to the witness's ranch. Mrs. Butler's place on the road was about three miles from witness's ranch. Deceased, defendant and Odom were about the same in size; defendant being, per-haps, a shade smaller than either of the other two mentioned.

Nathaniel Thomas testified, for the State, that he lived on Mrs. Butler's place on the Yorktown and Helena road. One evening about the time of the killing of Stonebraker, but whether on the evening of that day or of a day previous or subsequent thereto witness was now unable to say, he saw a man traveling the road towards Helena whom he took to be and believed was the defendant, although he was not willing to swear to that fact. That man asked witness if he had re-cently seen a herd of cattle pass over the road. Witness told him that a herd of cattle passed a short time before, and the man rode on. Witness was herding sheep on the said evening when he saw and spoke to that man. That man was riding a bay horse.

Mark Moore was the next witness for the State. He testified that he lived on the main road between Helena and Yorktown, and about two miles from Rutledge's ranch. Witness and his son Harvey, traveling in a two-horse wagon, went to Yorktown on the fatal Monday, where, at about eleven o'clock a. m., the

witness saw the defendant. He saw the defendant again on the evening of that day. Witness and his son were then on their way home from Yorktown, and the defendant, on horseback, was traveling the main road behind them, going towards Helena. He at no time approached the 'wagon nearer than seventy-five yards. When the defendant reached the corner of Short's fence, about a mile and a half distant from Rutledge's ranch, he left the road and went towards the said ranch, but did not take the trail. Defendant was then riding a bay, pacing horse. It was about an hour or an hour and a half before sun set when defendant left the road at the corner of Short's fence. Harvey Moore corroborated the testimony of this witness.

Max Polschinzski testified, for the State, that he was at Rutledge's ranch at the time of the killing of Stonebraker. He and William Schneider helped Stonebraker to drive a herd of cattle from Yorktown to that ranch on that day. They reached the ranch with the cattle after dark. Odom met them near the ranch, and helped them pen the cattle. Odom then said he would prepare supper, and a fire was built near the back door of the north room, and between the house and the fence. Witness and Schneider then sat down near the fence, and nearly but not quite opposite the door, and began to eat some dried beef they found on the fence. Stonebraker came to the door and asked witness and Schneider: "Boys, what are you eating?" Witness told him, and he replied: "If you don't look out, you eat some bugs." At that instant a shot was fired, the witness thought from the front of the house, and Stonebraker fell, exclaiming: "O, God! I am killed!" Witness and Schneider, thinking it a joke to frighten them, sat still for a minute or two, and then got up, and on hearing Stonebraker groan, and discovering blood on the floor, they fled, going as far as Gaibler's ranch, ten miles away, before stopping. William Schneider corroborated the testimony of Polschinzski.

S. Thomas testified, for the State, that he lived near Mrs. Butler's place, on the Yorktown and Helena road, and was the father of the witness Nathaniel Thomas. His said son was herding sheep near the said road on the Monday of the killing. When he came home that night, Nathaniel told his mother, in witness's hearing, that he saw the defendant on the road that evening. After the arrest of the defendant, on the next day, the witness went to where his son was herding sheep, and asked him again about seeing defendant on the previous evening,

and cautioned him to say nothing about it unless he was certain about the identity of the man he saw. Nathaniel replied: "I am not certain, but I think it was Peace."

Alonzo Allee testified, for the State, that he was either at his ranch or in the immediate neighborhood on the fatal Monday, and was certainly at his ranch on the said Monday night. The defendant did not come to his house on that day or night.

F. R. Graves, county attorney of Karnes county, testified, for the State, that he went to Rutledge's ranch on the morning after the killing of Stonebraker. He found four buckshot holes in Stonebraker's body. Two of the shot which passed through the body were found in the clothing. They corresponded in size and appearance with the single buckshot which witness found in a box on a shelf in the room. This witness described the Rutledge ranch place as did Rudd, and stated that there was a large tree north of the house, about ten steps from the fence, and that between thirty and forty steps from the fence there was a pen and part of an old crib. The corner of the pen and the said tree were about on a line with the north door of the house.

Emil Schultz testified, for the State, that he lived in Helena, Karnes county. He attended a party at Yorktown on the night of April 19, 1887, and on the next day went home, accompanied by defendant as far as Short's corner, where the trail to Rutledge's ranch left the road. On the road the defendant said to witness, in the course of a conversation about Stonebraker: "Did you see the son of a bitch singing and dancing last night? He ought to be killed, and, God d—n him, I am going to kill him the first chance I get." The witness regarded the threat as a serious one, seriously made, but never communicated it to Stonebraker, as he never afterwards saw Stonebraker.

John Green testified, for the State, that about two weeks before the killing of Stonebraker, the defendant met witness on the streets of Yorktown and asked him: "Don't Stonebraker board at your house?" Witness replied that he did, and defendant said: "He is a son of a bitch, and I intend to kill him." Witness did not know whether defendant was talking seriously or not. He did not communicate that threat to Stonebraker.

William Metz testified, for the State, that he was present at and heard a conversation between defendant and John Rutledge, in Yorktown, on the Saturday before the killing of

Stonebraker. While defendant and Rutledge were standing in front of Meyers's saloon, Stonebraker drove by in a buggy. Defendant asked Rutledge: "Who paid for that buggy?" Rutledge replied: "I did." Defendant then asked: "Who paid for the piano?" Rutledge replied: "I think I did." Defendant said: "And now he has taken my feather bed. He has gone as far as he can without killing." The witness thought that defendant uttered that threat seriously, but he did not communicate it to Stonebraker.

Fred Zedler testified, for the State, that he was a clerk in a mercantile house in Yorktown. Defendant came into the store on the day before the killing and began to talk about Stonebraker. He accused Stonebraker of taking a buggy from the estate of his, defendant's, deceased sister, and said something about a piano in the same connection. He concluded by saying: "And now he has stolen my feather bed." Witness asked him: "Johnny, what is the use of making all this trouble, when a few words of common sense will settle the matter between you and Stonebraker?" Defendant replied: "No; I won't speak to him; I am here to prosecute him for stealing my bed."

William Theisen testified, for the State, that defendant came to his blacksmith shop in Yorktown on the Saturday preceding the fatal Monday, and asked him: "Didn't I get you to make the buggy that Stonebraker has, for my sister?" Witness replied: "No; Mrs. Terry ordered it herself." He then asked witness: "Who paid for it?" and witness replied: "John Rutledge." Defendant then asked witness: "Why did you help Stonebraker take the piano that belonged to Mrs. Terry's children?" Witness replied: "I did not do so. Stonebraker wanted me to send for it, but I declined, as I thought trouble might come of it." Defendant then said to witness: "You were told, and you knew, that the piano did not belong to Stonebraker. But he got it and the buggy, too. Now he has taken my bed. I think his pot is about full, and it is likely to run over."

The State closed, and the defense introduced no evidence.

The application for continuance set out that by one of the absent witnesses the defendant would prove that, a day or two before the killing of Stonebraker, two men, whom the witness did not know, came to Rutledge's ranch and asked if defendant and Odom were there; that the witness replied in the negative,

when the two men looked through the house and rode off. By another witness the defendant expected to prove that he, the said witness, saw the outlaws, Jacobs and Schneider, in Rutledge's pasture a day or two before the killing of Stonebraker. This proof was claimed to be material in view of the proof on the trial, that defendant had often, as one of the sheriff's posse, searched the country for the purpose of arresting Jacobs and Schneider.

No brief for the appellant on file.

*W. L. Davidson,* Assistant Attorney General, and *Fly & Davidson,* for the State.

WHITE, PRESIDING JUDGE.   Appellant was indicted and tried in the lower court for the murder of one Stonebraker, and was found guilty of murder of the first degree, with his punishment affixed by the verdict and judgment at imprisonment for life in the penitentiary.   No appearance has been entered nor brief filed for him by counsel on this appeal; notwithstanding which, however, we have most carefully considered the entire record to ascertain if any error had been committed in the conduct of the trial in the lower court.

Defendant made a motion for continuance, which was overruled and an exception duly reserved to the ruling.   In the light of the other testimony which was adduced we do not believe that the proposed absent testimony, even if we should consider that it was admissible and probably true, would have been of any materiality in affecting the result of the trial.

The only other bill of exception was reserved to the charge of the court.   It points out no particular error.   A general rule well established is that "a bill of exception taken generally to the charge of the court, specifying no particular error or errors, has no standing and will not be considered by this court.   In the absence of a proper bill of exceptions this court will examine the charge of the trial court only with regard to fundamental errors, or such as under all the circumstances of the case were calculated to injure the rights of the accused." (Smith v. The State, 22 Texas Ct. App., 316; Williams v. The State, Id., 497; Cordway v. The State, 25 Texas Ct. App., 405.) We find no such error in the charge of the court as would authorize a reversal of the judgment.

It only remains to consider the sufficiency of the evidence to support the verdict and judgment. Without recapitulating the facts, which will be reported, suffice it to say that the testimony, though circumstantial, establishes sufficiently motive, threats, preparation and proximity to the scene of the homicide on the part of this appellant, besides other circumstances of inculpatory character. The verdict and judgment are supported sufficiently by the evidence, and we would not be warranted in interfering with them. The judgment is affirmed.

*Affirmed.*

Opinion delivered January 19, 1889.